Justin Schwartz for Yassas Rodrigo. May it please the court. This is an appeal from a summary judgment in an ADA case. Yassas Rodrigo was terminated from his position as a medical resident at Carle Hospital Foundation in October 2012 because he didn't pass step 3 of the Illinois medical licensure exam in three tries. At least that's what the defendants would have you believe. Mr. Rodrigo believes, and I'm arguing on his behalf, that their jury could conclude that he was terminated because of discrimination based on disability. In his case the disability is insomnia, restless leg syndrome, and sleep undisputed by the district court or the defendant. Under any summary judgment issue, the issue is consideration and appeal. The question is are there genuine issues of material fact for the jury? And in this case there are. These include, firstly, whether there was a meaningful policy that the the appellant's Mr. Rodrigo's, Dr. Rodrigo's termination. I should mention that Dr. Rodrigo is now a licensed physician in Michigan having passed the medical exam. And in particular whether it is an employment policy as opposed to an educational policy or whether it is in fact so ambiguous as to basically give no guidelines at all. Either on the face of it... Yes, Your Honor. Mr. Schwartz, what is your best evidence in the record that Dr. Rodrigo informed Carl that he suffered a disability? Is there anything... Sorry, Judge Rovner, we're not hearing you. Yes, Judge Rovner asked what the Dr. Rodrigo informed Carl that he suffered a disability. And let me refer you to the relevant section here. Well, I was wondering if he did anything other than telling his employer that he was tired and not sleeping well. If Your Honor, the Carl itself replies, refers to record evidence of Mr. Rodrigo's claims in page 42 of its brief. And I will cite my own examples for this. Okay, this is on page 21 of my initial brief where, please note, he doesn't have to provide a diagnosis. He just has to tell them. And there were discussions about sleep issues starting in fall of 2001, including in April 2011 with Drs. Kim Nelson and his supervisor, Dr. Gopal, generally... Counsel, I think you're questioning. Okay, Your Honor. Every medical resident has sleep issues. If you're on an 80-hour workweek, you have sleep issues. The question is whether there was any notice of a disability that is a particular medical cause of the sleep issues. That is what I understood my colleague to be asking. He had a medical sleep evaluation which he informed Dr. Gopal of in November 30, 2010. He talked with Dr. Nelson about sleep issues, not general tiredness, but insomnia. Right. And the hospital said, roughly, every resident has that problem. I wish you'd address the question whether there was any particular notice that there was a medical disability as opposed to this being an ordinary attribute of being a I think that, in particular, in light of Dr., of Carl's credibility problems, including those of Dr. Gopal... I think the answer to my question is yes or no. Yes. And if it is yes, tell me where in the record I can find it. I've been giving you cites, Your Honor. I refer you, Your Honor, to page, pages 21 and 22 of my briefs. It's a whole series of citations. Of course, if you have insomnia, you have sleeping problems. And in addition, without any question, there's a... Dr. Gopal says that when Dr. Rodrigo informed him after his third attempt at the exam that he had this disability, that he became aware that there was the disability and chose to do nothing about it. Chose not even to begin an interactive process or attempt an accommodation. In the fall of 2012, counsel... Yes. As he's ready to start his third year, but he's given time off, right? Yes. To take the exam. Is there any other accommodation that would have been sufficient for him to pass that exam other than the leave of absence? He asked for more time. He asked for repeated efforts. He eventually did pass the exam, so clearly there weren't accommodations that would have been sufficient. Is it correct that that left him, though, the third failure left him essentially unable to be licensed in Illinois? Okay. What we've got here, as I understand it, is a residency program for the purpose of training doctors to be licensed in Illinois, right? It's training doctors to be licensed as medical professionals. It happens in dental, although it's important that doctors in Illinois are licensed in Illinois. So I guess what I have trouble with in your position here is that you seem to want to distinguish between the hospital's policy for employment purposes and for educational purposes. I don't make that distinction. They do. So is it reasonable for the hospital to insist that its residents be eligible for licensing in Illinois? Whether it's reasonable or not, the question is whether they have a enforced, unambiguous, systematic policy of doing so. Let's take it one step at a time. First, the question I asked you, is it reasonable for a residency program in Illinois to insist that its residents be eligible for licensing in Illinois? I'd say it's not unreasonable, yes. I'll take that as yes, it's reasonable. Okay. And then, is there any evidence that under Dr. Gopal's directorship that the hospital did not enforce that requirement? The only case where it came up is Dr. Rodriguez. Right, okay. Apparently, and according to the record, anyway. And what's ambiguous about the policy? Well, I mean, if you look at what the policy says. This is the 2012 policy? There are several policies in play. I'm looking at the one in effect at the title of the policy. It's Exhibit 22 in your appendix. Yes, I understand. It's a short appendix, I'm sorry. Exhibit 22, the one with no title, the thing called policy number that has no number. Yes, there's an... I'm sorry, please reformulate the question. What's the ambiguity? Oh, it says that you have to receive a passing score by the end of your second year. It's a graduation requirement. You have to pass it before you get a contract. And then they say, and this is interesting because it would appear to say, and in fact it does say, that more than two fails will result in termination from the program. The point is, that's not what they do. And it's not what they, the policy they applied, it's not what they discussed. The range of issues involved are in the contract offered. It says they're not obligated to renew. It doesn't say they're obligated not to renew. That's a separate issue, I would think. Right, but the thing is that these policies are taken like a contract as a whole. And you look at the policies, and this is actually the instruction of the ADA, as applied in the particular case. So it's to the point that when the assistant program director talks to Dr. Rodrigo about his second failure to obtain a passing score, he doesn't say you're going to be terminated if you don't do it a third time. He says there are potential grounds for termination. Dr. Gopal tells him, you could result in termination, not it will. When Dr. Gopal discusses the issue with his own supervisor, he discusses a range of possibilities, one of which is giving Dr. Rodrigo endless retakes. He doesn't say what you would expect if this were actually the policy, if they actually intended to follow the literal words on this page. We can't do anything. We've got to terminate. And finally, he says that Dr. Rodrigo has to get away from the program so he can prepare himself, get himself in shape to pass the thing. That's how they implement the policy. Whatever the words here say, what they mean is what they do. It sounds like no good deed goes unpunished. That is, if the defendant indicates a little flexibility, doesn't use the harshest possible warning terms, that that will be if we say endless retakes. That's not a little flexibility. Who suggested endless retakes? Dr. Gopal talking to his superior, Dr. Daugherty. In what kind? In this discussion, immediately after the see exhibit 4 page 69, this is the right one, that's theirs, this is mine. It's in the right hand side. Okay so I'm sorry, page 68. So there was some small discussion about letting in continuous clinical duties, which by the way is against the stated terms of the policy, supposedly, and let him take the test an infinite number of times. And so that's on exhibit 4, page 68 of my appendix. So the thing is that when it comes down to how the policies actually implemented, both in the way they talk about it and the way they discuss it, this is not their policy. And if the amount of discretion involved is essentially infinite, as it would be if they're allowed to let him take time off to get himself in shape, let him to continue his duties in contravention of the literal words of the policy as stated in that thing called policy, if they allow him to take it an infinite number of times, this is not a meaningful policy. And it's still unclear whether it's an educational policy or an employment policy, unlike for example the case in Lyson, which says you don't have a job as a firefighter. You don't have a job unless you're certified. That's a policy. Thank you, Counsel. Mr. Fawaz.  Good morning, Your Honors. May it please the Court. Michael Fawaz on behalf of the Defendant Appalee Carl Foundation Hospital. Your Honor, there are two reasons that the District Court's decision should be affirmed. The first is that Dr. Rodrigo was not a qualified individual with a disability on the date of his separation from Carl. And that is a dispositive factor that eliminates all three of his ADA claims. Alternatively, a review of the three claims shows he did not meet his prima facie burden. Focusing on the issue of qualified individual, the ADA only protects those who can do a job with or without reasonable accommodation and handle all essential functions. While this Court has held essential functions can include obtaining required licenses. And in the Lloyd v. Swifty case, this Court held, quote, the employer, not a court, determines what functions are essential and we will not second guess that decision. That's actually an overstatement, right? We've got a lot of cases that also say we don't defer completely to employers. Miller against Illinois Department of Transportation, Schell against Smith treats it as a factual issue. Otherwise, there wouldn't be much point in the law if an employer could simply announce what is an essential function. That does come from the Lloyd decision, what I just quoted. However, you're absolutely right, Your Honor. Other decisions say that there are a number of factors that can be considered. The employer's decision may not be dispositive, but it is certainly one of the more essential determinations in terms of what an essential function of the job are. But in this case, the hospital reasonably has determined that passing an Illinois licensure are reasonable requirements of this job, passing the USMLE. Dr. Rodrigo, we were very candid in our brief, was a qualified individual for a period of time, qualified to get into the program. He struggled in the beginning, went through remediation, and then proceeded to his second year. He was elected co-chief, and even though he hadn't even reached PGY3, which is a stated policy, he was doing well, and they actually paid him his stipend to take on the role of co-chief resident despite not having met all the requirements. This was in 2012. Now, once he had failed Step 3 three times, coupled with his prior two failures of different USMLE, Illinois state law precluded him from Illinois licensure as a matter of law unless he was to undergo significant remediation efforts. The statute, as you can imagine, is tough. It's something like a one-year study program in addition to whatever else a resident is required to do. There's no evidence that plaintiff ever wanted to undertake that remediation efforts, and so in October 30, 2012, when they separated, he was not a qualified individual. He could not pass the licensing exam. He couldn't be licensed in Illinois, and as a matter of law, that terminates all of his ADA claims. Now, we rely on the Laysen v. City of Shelbyville case, and I submit to you that it is not a distinguishable case from the case at hand. In that case, the city had a reasonable policy. Firefighters must be licensed paramedics. Ms. Laysen had taken the exam and tried to get certified twice before she joined the City of Shelbyville. Failed. When she joined the City of Shelbyville, she took the exam, she attempted to take the exam two more times. It's a program where it's about 18 months. She failed twice. She asked for an extended, excuse me. Laysen looks pretty close, but could you address the argument that Dr. Gopal and his colleagues actually considered being flexible about this up-or-out policy on the exam, and the argument that their discussion about that possibility shows, or at least presents an issue of fact about whether it really was the policy? Your Honor, I would submit to the Court that every employer has discretion in the implementation of all its policies. In fact, the cornerstone of the ADA is that there is some flexibility and some discretion in determination of issues on a case-by-case basis. What the plaintiff is doing is conflating this idea that discretion automatically equals discrimination, and it doesn't. The law affords an employer discretion. The employer simply can't exercise that discretion in a discriminatory manner. Well, now, the argument I understand a little bit differently to be that while a strict policy, passing your first three tries or you're out, might well pass muster under the ADA, that wasn't actually the hospital's policy. Well, Your Honor, Dr. Gopal's testimony that in his tenure, which lasted seven years as program director, no one, he had never made an exception for anyone under the policy as far as he was concerned. So what do we make of this evidence that he, that was just quoted a little bit earlier, to the effect that Dr. Gopal and Dr. Doherty were discussing the possibility of further test taking, further flexibility? Your Honor, that is absolutely true, and I think it goes to the point you raised that no good deed goes unpunished. They were looking at options. Was there an opportunity here to give him a chance to take the test again? Or is there something else they could do for him to help him pass? And reflecting on alternatives to the stated policy, they determined reasonably that they don't think he could pass the test. He couldn't get Illinois licensure, and so they determined, they made the decision, a reasonable decision, to apply the policy as written, that they were not going to create an exception for Dr. Rodrigo when they had created an exception for no one else before. If anything, they were looking to favor him in some respects by considering if there's anything they could do for him when they had not done that for anybody. Right, but the ADA does require employers under some circumstances to, under many circumstances, to be flexible about such policies and rules, right? That's absolutely fair. The cornerstone of it is flexibility, that you cannot, not every case is the same. And so here, they gave you some consideration, but I think it goes back to a question Judge Rovner asked Mr. Schwartz. Did they even have knowledge of a disability at the time he'd left Carl? There was evidence from the fall of 2010 that there was discussion about whether Dr. Rodrigo should go through some kind of fairly scientific evaluation of his sleep condition. Your Honor, what prompted that? It was actually early 2011. Dr. Rodrigo had failed two rotations in his first year, went through remediation, and then he failed the same two rotations a second time. And what they were trying to tell him to improve, to be better. Could there be a problem? And Dr. Gopal was very candid. He said, I don't diagnose my residents. I don't treat my residents. We just thought, why is he making the same mistakes over and over again? Could there be a problem? So they recommended some testing to determine if there was a problem, and if so, what accommodations could exist. That never happened? It never happened, and the record shows Dr. Rodrigo tried to disclaim that in the facts on summary judgment, but we've attached it to our supplemental brief. He was to go ahead and schedule it himself. He never scheduled it. But then, Your Honor, what happened at the rest of 2011 was, he went through the second round of remediation, never went back on remediation, moved up to his second level, was doing so well that his other residents nominated him to be co-chief resident. The hospital was so impressed with the turnaround that they agreed to pay his stipend and actually give him the position, even though he hadn't reached the third year. That, to them, evidenced there was no problem. If anything, his success, his doing so well, showed that there was not any sort of disability. You go into then the rest of 2012, and that's when he starts failing Step 3 over and over again. And the record for November 30, 2012, it was a doctor's note from a doctor named Dr. Davies. That was the first time written documentation was presented by Dr. Rodrigo indicating that he had some sort of sleep issue, the sleep apnea, etc. Before then, Your Honor, it had touched on this very clearly. It was generic complaints of being tired. The complaints were always tied to the workload is too much, I'm too tired, I'm just not sleeping well. And it was complaints that Dr. Nelson and Dr. Gopal testified to was common amongst not only the interns and the residents, but even the attending physicians raised similar complaints. Nothing that would have put Carl on notice of a specific disability and the need for specific accommodations. Judge Hamilton, you had asked the question, after he had failed Step 2 twice, was there any other accommodations besides the leave of absence that Carl could have given him to help him pass the USMLE? And I would ask the Court to just take Dr. Rodrigo's own testimony in this regard, where he said, and I quote, at that time, there was nothing else Carl could have done other than give him a leave of absence. And I think it's telling that he didn't want the leave of absence. Carl insisted he take it so that he can focus on what he described as the most important thing in his professional life at that time. So the only accommodation he's ever suggested, even without them knowing of any disability, was to give him time off to study, which they did. So I would say, Your Honors, as to this dispositive issue, the fact that he was not a qualified individual with a disability, as of the date of separation, is a dispositive issue, and it eliminates all three of his claims. The Taylor-Navotny case and others support that, Laysan as well. Okay. Counsel, one of the issues that's been raised by plaintiff is that Carl was actually out of compliance with national policies about workloads for residents, and that this bubbled up into a problem after Rodrigo had been terminated. It bubbled up, Your Honor, I believe sometime in 20, I want to say 2014. So it was probably a year and a half after that fact. My understanding is, again, it's not in the record, so I'm sharing, I believe everything has been reinstated and there's no longer an issue. As to the specifics, I don't know. But it suggests there might have been problems back at the time Rodrigo was a resident. It's possible, but there's no record evidence in support of that. It's mostly suggestions of what transpired after October 30, 2012, which is his separation date. Your Honors, briefly, just looking at the individual claims to the extent the court goes beyond whether he was a qualified individual. As to his disparate treatment claim, plaintiff proceeds solely under the indirect method under the McDonnell-Douglas standard. He has to present a comparator. That is the key element to establishing your prima facie case. He chooses an individual, a single individual named Dr. Rhee, who graduated in September of 2006, four years before Dr. Rodrigo even joined the program. At that time, it is uncontested, there was no USMLE policy. It was adopted in 2007. Dr. Rodrigo had been employed there for three years with the policy in existence. There were different supervisors. And most important, the evidence is clear Dr. Rodrigo could not qualify for an Illinois license, but there is no such evidence as it relates to Dr. Rhee. And precedent of this court makes clear that the comparator must suffer from similar failings. That alone is enough to eliminate the disparate treatment claim. On that claim, in their brief, and again, obviously this was discussed today, but plaintiffs go back to this idea of there was discretion. Therefore, there must have been some kind of discrimination. They were considering other options. The policy was unclear. It's not even a clear policy. On October 28th, after Dr. Rodrigo had failed Step 3 a third time, he put in writing, in an email that's part of the record, it's docket 18-26, it's exhibit 25 on summary judgment, quote, I realize termination of my residency is a valid option. The policy was not ambiguous. It was well known what the risks were of failing to pass the USMLE Step 3. Looking at the retaliation claim, here plaintiff chooses to proceed under the direct method, but his retaliation claims fails for two reasons. He has never identified an actionable protected activity, and he has never connected any protected activity to causation. He mentioned sleep issues in early 2011. Again, they were generic complaints, nothing that was actually engaging a protected activity, but it's also barred by the 300 day rule. No, it's not. Your theory there seems to be that if an employer waits for 301 days from the protected activity and then takes adverse action, that it's immune from liability. The clock starts with the adverse employment action, not with the original protected activity. Why don't you skip that one? Okay, I'll move on. The final claim, Your Honor, is whether plaintiff is, excuse me, the failure to accommodate claim. With that claim, plaintiff identifies a request at the end of 2010 for a reduced workload, but as we've discussed, that was a generic complaint of being tired and not sleeping well. There was nothing about an actual disability. His other request was a request for reinstatement in November 2012 after his separation from Carl. The problem with that one is twofold. One, at that time, as we've discussed, Carl did not have knowledge of an actual disability. He didn't submit anything to Carl until the end of November. But second, on its face, the request for reinstatement is unreasonable, and I think Lason captures that quite well. In that case, what she had sought was an extended contract. Her contract was three years. She wanted more time to be there. And what the court said was, an employer does not have to change basic job qualifications just because someone is disabled. The evidence showed only that Lason simply could not qualify as a paramedic. Well, here, it took Dr. Rodrigo two full years after the first time he passed failed step three to ultimately pass it. There was no obligation. Thank you, counsel. Thank you, Your Honors. Case is taken under advisement.